**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

YAHYA TAHER ALBANNA,

         CIVIL ACTION NO. 15-cv-14264
    *Plaintiff*,    DISTRICT JUDGE JOHN CORBETT O'MEARA
*v.*         MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

  *Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 15, 16)**

## I.  RECOMMENDATION

  In light of the entire record in this case, I suggest that substantial evidence does

not support the Commissioner's determination that Albanna is not disabled. Accordingly,

**IT IS RECOMMENDED** that Albanna's Motion for Summary Judgment, (Doc. 15), be

**GRANTED**, the Commissioner's Motion, (Doc. 16), be **DENIED**, and that this case be

remanded under sentence four of 42 U.S.C. § 405(g) for further consideration.

## II.  REPORT

### A. Introduction and Procedural History

  Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of

Reference, this case was referred to the undersigned magistrate judge for the purpose of

reviewing a final decision by the Commissioner of Social Security ("Commissioner")

denying Plaintiff Yahya Albanna's claim for a period of disability and Supplemental

Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. ("DIB") under

1

Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 16).

Plaintiff had filed a previous application, a hearing was held, and Administrative Law Judge ("ALJ") Revels found Plaintiff could perform a limited range of light work and thus, was not disabled. (Tr. 11.) This decision was affirmed by the Appeals Council and is binding through August 24, 2011, the date of the decision. (*Id.*)

On May 21, 2013, Albanna filed an application for SSI, alleging a disability onset date of June 24, 2005. (Tr. 195-201).[1] The Commissioner denied his claim. (Tr. 111-36). Albanna then requested a hearing before an ALJ, which occurred on March 27, 2014, before ALJ Patrick J. MacLean. (Tr. 25-58). At the hearing, Albanna—represented by her attorney, Salwa Khatib—testified, alongside Vocational Expert ("VE") Don Harrison. (*Id.*). The ALJ's written decision, issued April 23, 2014, found Albanna not disabled. (Tr. 12-24). On October 2, 2015, the Appeals Council denied review, (Tr. 1-4), and Albanna filed for judicial review of that final decision on December 7, 2015. (Doc. 1).

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of

---

[1] This date was amended to match the application date at his hearing. (Tr. 28-30).

evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual

functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Albanna not disabled under the Act. (Tr. 11-20). At Step One, the ALJ found that Albanna had not engaged in substantial gainful activity during the period from his alleged onset date of May 21, 2013. (Tr. 13). At Step Two, the ALJ concluded that the following impairments qualified as severe: "diabetes, coronary artery disease, cardiomyopathy, major depression, bulging cervical spine discs, a schizoaffective disorder, and obesity." (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 14). Thereafter, the ALJ found that Albanna had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> [H]e cannot climb ladders or ropes or scaffolds, can occasionally balance, stoop, crouch, and climb ramps and stairs, can frequently kneel and crawl, is limited to simple routine repetitive tasks, is limited to low stress work

which is characterized by only occasional changes in the work setting, and he can have only occasional interaction with the public and co-workers.

(Tr. 15). At Step Four, the ALJ found Albanna "unable to perform any past relevant work." (Tr. 18). Then at Step Five, the ALJ noted that Albanna has "a 'marginal' education, and he is able to communicate in English," and determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 18).

### E. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Albanna's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

#### i. Function Report

On June 24, 2013, Mr. Saad Abdal filled out and submitted a Function Report on behalf of Albanna. (Tr. 256-63). It said that Albanna was limited by "very severe" back pain that prevented "bend[ing], lift[ing], twist[ing], or even sit[ting] for a long period of time," as well as "neck pain," "left leg pain," "poor sight," and "poor memory." (Tr. 256). Albanna described his daily activities as washing his face and body with help from his wife, and then "I walk a bit, then I rest, I eat, sleep and rest." (Tr. 257). Before his illness, he "used to work, walk, take care of myself." (*Id.*). His ailments affected his sleep because "due to severity of my injuries, I cannot turn in bed. My muscles are so weak."

6

(*Id.*). According to the form, Albanna could not dress, bathe, care for his hair, shave, feed himself, or use the toilet without his wife's help. (*Id.*). His wife also needed to remind him to take his medicine and take care of himself. (Tr. 258). In addition, because he could not do house or yard work, his son would help "do[] it all . . . ." (*Id.*).

To get around, Albanna indicated that "I don't go out alone, only with family" because "I don't know where to go" and "I get lost fast." (Tr. 259). Though he "used to drive before," he did not any more because "my son will not allow me" and "I got lost [two] time[s]" and "one time they took me to the hospital by police and one time pe[ople] call on my phone to my son." (*Id.*). Due to his conditions, Albanna said he could not pay bills, count change, handle a savings account, or use a checkbook or money orders. (*Id.*). Indeed, "I am unable to do any[thing,] I think I did lose my mind," and "my doctor told my family I should be in the hospital for mental problem evaluation I have to[o] many medication[s] that it['s] hurting me and my mind." (Tr. 260). He also identified no places he went on a regular basis, because "I always stay home" and "no one takes me out to places fearing that I will say something wrong." (*Id.*). This presented social difficulties, because he would "get very upset without knowing why." (Tr. 261).

Providing information about his abilities, Albanna marked difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (Tr. 261). He could walk less than half a block before needing a twenty minute rest. (*Id.*). He has used a cane for two to three years, both for walking and standing. (Tr. 262). Though medications are not enumerated, a note

7

indicates "I have a list of medication that give a lot of side effects, gets me upset, mad, stomach problem, vis[]ion problem, dry mouth, dizziness, headaches, sleepy, and more." (Tr. 263). Another note from Mr. Abdal rests at the bottom of the Function Report: "I am here helping Mr. Alban[n]a with his form b/c his attorney is out of town and his son started the form but he stopped [and] asked me to help and I did with his help . . . ." He noted as well that "the father is very bad and unable to give me the answers well but the son helped" and explained that Albanna took "a lot[] of medication and was very tired." (*Id.*).

### ii.      Albanna's Testimony at the Administrative Hearing

At his hearing before ALJ Patrick MacLean, Albanna confirmed that he filed prior applications for social security benefits, with "the most recent prior application having been filed in October 2009 under both Title II and Title XVI, which resulted in an unfavorable ALJ decision issued August 24, 2011." (Tr. 28). Albanna also consented to changing his alleged onset date to the date of filing, May 21, 2013, though he said, "all I know is that I applied in 2011. And anyway, I don't know anything because I'm tired." (Tr. 29). His attorney then identified his alleged impairments as "back pain, neck pain, chest pain, depression and anxiety, coronary artery disease, . . . dizziness, headaches, leg pain, [and] dyspnea, . . ." (Tr. 30). "Psychiatric problems, mental problems, heart problems, I got everything." (Tr. 36). When asked if he "understand[s] any English," he replied "No. Little bit." (Tr. 31). An interpreter accompanied Albanna at the hearing.

Albanna indicated that he "left school" and "went to work," so did not complete "any grade" in school in Yemen. (Tr. 33). He came to the United States in 1990, and is

not yet a citizen because "[i]t costs $650 and I didn't have that money." (Tr. 34). He "tried to go to school but my family made me work in stores and they left me." (*Id.*). "I was busy working in stores and I'm very upset because I didn't learn English." (*Id.*).

Albanna lived in a "two-family home. Two rooms down and two rooms up," which the interpreter guessed was "a roof and it's fixed up so people can rent it." (Tr. 35). He did not ascend the stairs because "I can't go up any stairs. Sometimes I try to move my body, use the medication, get my medication and I go up. And then I run to take the pills so I can sleep." (*Id.*). He lived with "five kids" and slept "on the couch." (Tr. 36). "I just have a wife and she has nothing to do with me and she's tired of me being the way I am and the only thing she does for me is she hands me the food. . . . The whole family is not doing good." (*Id.*).

The ALJ asked about Albanna's capacity to perform house work next. Albanna's responses remained flippant: "I'm not doing good. Look at me. I don't even wash or shave. My wife tells me wash up and I tell her I don't have it in me." (Tr. 37-38). Describing his daily routine, he said "I watch TV five minutes then I walk in five minutes and I take my medication. Then I take medication for the fear. . . . My kids don't have school clothes, my wife doesn't want anything – doesn't have anything. I'm doing bad." (Tr. 38). "My wife changes me" because he cannot clothe himself. (Tr. 49). This state of being marked a serious departure from his previous self, Albanna suggested, because "I used to work and I did not know the language. But when I used to work on a project they wanted me to work because I had the ability and I was strong. If I could work you think I would be sitting waiting for $600 a month? I don't want $600, what do I give my

9

family." (Tr. 38). He attributed his decline to being "beaten" and "stabbed in my head by my brother" as well as a "car accident." (*Id.*).

His previous job, Albanna contended, was working "for the FBI for the terrorists. . . . I told about the criminals. . . . I told on them because they were sending all kinds of millions to the Al Qaeda and to the Yemen. Now, all the Arabs know that I work for the FBI. Nobody like me, nobody touch me, nobody help me for money." (Tr. 39). Eventually, "I signed my name that I was working for the FBI against Al Qaeda. . . . I wanted a check. So they fired me." (Tr. 40). The ALJ noted that, while "very interesting," such employment did not "show up in the earnings record." (*Id.*). When asked if he could work again, Albanna asked, "Where am I going to work?" though he denied "go[ing] to a mental hospital" at any point. (*Id.*).

Albanna had a driver's license, and he took a test with the assistance of an interpreter. (Tr. 41). He had a car, but "I don't drive it. . . . I know how to drive but now that I'm sick, I can't drive." (*Id.*). The ALJ pushed further, asking if he was talking about mental or physical health, and Albanna replied, "Didn't I tell you in the beginning what they did to me and what I did for America and how I took care of America, didn't I just say that and how I was stabbed with a knife and what the Arabs did to me and I now am living in fear. I did everything for America, I did. No one protected me. He came, he hit me with a knife, stabbed with a knife. He went to Yemen, he came back, no one prosecuted him. No one protected me." (*Id.*). Confused, Albanna's attorney noted that "I did read about when he was stabbed in the head but I think this was a very long time ago." (Tr. 42).

Albanna said he did not have any friends: "No one wants to have anything to do with me." (*Id.*). He did, however, "go to my mosque" three blocks away for five to fifteen minutes each Friday. (*Id.*). He framed this and other answers in consistently indefinite or uncertain terms: He used his cane "Probably three years, four years, six years, I don't know exactly. Three years, four years, six years. Three or four years." (Tr. 43). He got headaches "[e]very 20 minutes, one hour. . . . every 15 minutes." (Tr. 49). Descriptions of his capabilities remained drastic: "I can't carry anything because I'd rather – I'm better off dead"; "I can't even barely hold this cane"; "My tailbone hurts me a lot and I need two people to lift me"; "It's broke, my whole back." (Tr. 45-46). He also indicated that his knee "comes out of place and then it'll  come back in place. The ligament." (Tr. 47). He said he experienced panic attacks that were "very dangerous." (*Id.*). And his medication only made the pain go away for "[f]ive minutes, it'll take and it's back. More medicine. Medicine, medicine." (*Id.*). Asked about hallucinations, he said "I have a disease, I have headache, [and] I have forgetfulness." (Tr. 48).

### iii.        The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Albanna's ability to perform work. (Tr. 45). Commencing Step Four of her analysis, the VE indicated that Albanna's work on the assembly line qualified as "[v]ery heavy" as performed, unskilled labor. (Tr. 51). The ALJ then asked the VE to assume "a person of the claimant's age, education and work experience and skill set who is able to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently and light work as defined by the regulations." (*Id.*). He also read the prior ALJ's RFC, indicating that "it's possible" he

would agree with it: "Except the claimant requires a sit/stand option at will; the claimant is able to bend, stoop, kneel and crouch on a less than frequent basis but requires a relatively clean air environment and no work at hazardous heights or around dangerous machinery. The claimant must avoid work with the general public and the work must not be at a production pace. The work must be unskilled work because there are moderate limitation[s] and ability to maintain concentration for extended periods and to carry out detailed instructions because of pain and symptoms from depression." (Tr. 52). The VE indicated that such an individual could neither perform such work as performed, nor as customarily performed. (*Id.*).

The ALJ then asked whether "[t]here would be other jobs in the regional or national economies for such an individual," and the VE indicated that other jobs existed "in the categories of assembly, inspecting and packaging" such as "small products assembler," with 1,000 jobs regionally and 50,000 jobs nationally. (Tr. 52-53). Other jobs included "laundry checker" with at least 1,200 regional jobs and 65,000 national jobs, and "hand packer" with 1,000 regional jobs and 50,000 national jobs. (Tr. 53).

The ALJ then shifted to the second hypothetical, keeping work at a light level, to a person "able to lift up to 20 pounds occasionally, lift or carry up to ten pounds frequently. . . . Occasionally climb ladders, ropes or scaffolds; frequently climb ramps or stairs; frequently balance; occasionally stoop and crouch frequent and unfrequently kneel or crawl. Limited to occupations that do not require communication, written or verbal communication in English. Work would be limited to simple, routine and repetitive tasks, employed in low stress jobs, defined as having only occasional changes in the work

12

setting with only occasional interaction with the public and with coworkers." (Tr. 54). Although such an individual could not perform Albanna's "past relevant work as . . . performed . . . or as customarily performed," other jobs in the regional and national economies existed, with the "same categories of jobs and the same examples" applying. (*Id.*). The only difference is that the numbers of jobs available would increase, with 2,500 regionally and 125,000 nationally as to the assembly category, 3,000 regionally and 150,000 nationally as to the inspecting category, and 2,000 regionally and 100,000 nationally as to the packing category. (Tr. 55).

In the third hypothetical, the ALJ asked the VE to assume a hypothetical individual "able to lift up to ten pounds occasionally, sedentary work as defined by the regulations. And then incorporate the other limitations from hypothetical two . . . ." (*Id.*). The VE insisted that past relevant work was unavailable, either as performed or as customarily available. (*Id.*). Then returning to the second hypothetical, the ALJ asked the VE to "keep all those limitation[s] intact and add" that "due to a combination of medical conditions[,] associated symptoms, and mental impairments this person would be off task more than 20 percent of an eight hour work day and therefore is unable to engage in sustained work activity for a full eight hour work day on a regular and consistent basis." (Tr. 55-56). The VE suggested that this would be work-preclusive. (Tr. 56).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513.

"Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to

"other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

16

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482

17

U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion

18

prevents reviewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. *See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof of changed circumstances. Thus, as applied in this Circuit, the SSAR 98-4(6) and *Drummond* essentially create a presumption that the

19

facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*." (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at *2, 8-9. These decisions make clear

that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

*Res judicata* is not a complete bar on reconsidering prior decisions or determinations: the regulations provide two mechanisms for such reexamination that escape the doctrine's effects. *Purter*, 771 F.2d at 691-93 (discussing reopening as an exception to claim preclusion). The first, less important to *res judicata* case law, occurs just after the initial determination, when the claimant's first step in the review process is sometimes a request for "reconsideration" of that decision. 20 C.F.R. §§ 404.907, 416.1407.

The more critical and complicated mechanism is reopening a prior ALJ decision. The regulations allow the Commissioner, through an ALJ or Appeals Council, to peel back the determination or decision and revise it. 20 C.F. R. §§ 404.987, 404.992, 416.1487, 416.1492. The claimant or the Commissioner can initiate the process. *Id.* The reopening of a determination or decision can occur "for any reason" within twelve months of the notice of the initial determination, but "good cause" must exist if the reopening occurs within two years of the initial determination for SSI claims and four years for DIB claims. *Id.* §§ 404.988, 416.1488. A DIB claim can also be reopened at any time under a few scenarios not relevant to the instant case. *Id.* § 404.988(c). Good cause exists, among other reasons, if "[n]ew and material evidence is furnished" for either type of claim, SSI or DIB. *Id.* §§ 404.989, 416.1489. If a determination or decision is reopened, *res judicata* does not apply. *Kaszer v. Massanari*, 40 F. App'x 686, 690 (3d Cir. 2002).

22

The decision whether to reopen, unless it implicates a colorable constitutional issue, evades judicial review: courts can only review the Commissioner's final decisions made after a hearing. *See* 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977) (holding that Commissioner's decision not to reopen is unreviewable). However, courts may review a decision not to reopen a case "to determine whether *res judicata* has been properly applied to bar the pending claim or whether, even though *res judicata* might properly have been applied, the prior claim has nevertheless been reopened." *Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999); *see also Kaszer,* 40 F. App'x at 690 ("But 'we will examine the record to determine whether or not a reopening has occurred.'" (quoting *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987))).

Implicit reopenings occur, with unfortunate frequency, where the ALJ crafts a decision that appears to "readjudicat[e] part of the period already adjudicated by the first decision" rather than "adjudicate only the subsequent period." *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013). As the Sixth Circuit lamented,

> If an ALJ intends to reopen prior decisions, he or she should say so, say why, and cite the appropriate regulation that permits reopening. If an ALJ intends instead to adjudicate only the subsequent period in light of changed circumstances, he or she should make this approach clear and cite the appropriate cases and acquiescence rulings. Regardless of which path the ALJs take, they must clearly state their approach.

*Id.*; *see also Haddix v. Astrue*, No. 10-30, 2010 WL 4683766, at *1-4 (E.D. Ky. Nov. 12, 2010) (remanding where ALJ's decision was unclear).

Constructive reopenings are found where the ALJ reviewed the entire record including the portions from the already adjudicated period, and decided "the merits of the

claim." *Tobak*, 195 F.3d at 186. Thus, the Sixth Circuit found a reopening where the ALJ considered the entire period "in light of the new evidence . . . ." *Wilson v. Califano*, 580 F.2d 208, 212 (6th Cir. 1978). An additional factor that could lead to finding an implicit reopening is the ALJ's failure to discuss the prior determination or the *res judicata* doctrine. *See Martin v. Comm'r of Soc. Sec.*, 82 F. App'x 453, 455 (6th Cir. 2003); *Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 620 (6th Cir. 1987). Nonetheless, an ALJ's review of old or new evidence does not necessarily signify a constructive reopening, for such a review would be required to decide against reopening as well as for it. *See Girard v. Chater*, 918 F. Supp. 42, 44-45 (D.R.I. 1996). The ALJ's discussion of new evidence likewise might relate to her independent determination of whether to grant benefits in the unadjudicated period, again indicating no reopening occurred. *See id.* at 44.

The ability to reopen—explicitly or implicitly—must meet certain regulatory requirements. 20 C.F.R. §§ 404.987-404.996, 416.1487-416.1494. Chief among these is the two year (SSI) and four year (DIB) time limits for good cause reopenings. *Id.* §§ 404.988, 416.1488. Consequently, an ALJ is powerless to reopen a claim outside these periods. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) ("Because more than four years had passed since the denial of the original application, the Commissioner could not have constructively reopened Glazer's case.").

### G. Analysis

Albanna raises three issues as to the ALJ's reasoning: (1) Whether the ALJ erred in evaluating the severity of Albanna's mental impairments. (2) Whether the ALJ erred in

accounting for the severity of Albanna's cardiac problems. And (3) whether the ALJ properly considered Albanna's language difficulties. Each objection is discussed in turn.

### 1.   The ALJ Erred in Evaluating the Severity of Albanna's Mental Impairments

Albanna contends that the ALJ wrongly discounted his medical impairment evidence. He notes, conceding some inconsistency among his statements, that his "significant medical problems" affect him in such a manner that "he cannot and should not be expected to be consistent." (Doc. 15 at 13). That the ALJ discounted his testimony due to these inconsistencies was allegedly error, because "[i]nconsistency is the essence of [Albanna's] condition." (*Id.*). Further, he directs the Court to several instances of supposed cherry-picking, such as citing damning evidence from a discharge summary without acknowledging that the report came "after [Albanna] had been psychiatrically hospitalized and medicated for *10 days*." (*Id.*). With respect to Dr. Youssef's findings in particular, Albanna suggests that the ALJ omitted from his consideration portions helpful to Albanna's case, and included harmful portions with abandon. (*Id.* at 15).

As SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996) states, the reasons underlying an ALJ's "credibility finding must be grounded in the evidence and articulated in the determination or decision. . . . This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision." Among the factors an ALJ must consider include "medical signs and laboratory findings"; any "[d]iagnosis, prognosis, [or] other medical opinions provided by treating or examining physicians or psychologists and

other medical sources"; and "[s]tatements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work." *Id.* at *5. In addition, the ALJ must consider factors such as the "individual's daily activities"; the "location, duration, frequency, and intensity of the individual's pain or other symptoms"; "[f]actors that precipitate and aggravate the symptoms"; the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms"; "[t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms"; any "measures other than treatment the individual uses or has used to relieve pain or other symptoms"; and "[a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." *Id.* at *3.

Of note, "[t]he argument that the ALJ mischaracterized or 'cherry picked' the record is frequently made and seldom successful, because 'the same process can be described more neutrally as weighing the evidence.'" *Morris v. Comm'r of Soc. Sec.*, No. 1:11-cv-154, 2012 WL 4953118, at *5 (W.D. Mich. Oct. 17, 2012). Arguments which in actuality require "re-weigh[ing] record evidence" beseech district courts to perform a forbidden ritual. *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014). But not all "cherry picking" claims inherently lack merit: "Substantial evidence

cannot be based on fragments of the record." *Laskowski v. Apfel*, 100 F.Supp.2d 474, 482 (E.D. Mich. 2000).

Upon thorough review of the record and briefing in this case, Albanna's claim that the ALJ cherry picked the record to defend an unfavorable outcome finds substantial merit. Significantly, the ALJ's opinion conspicuously omitted any discussion of Albanna's (ostensibly false) impression and insistence that he worked for several years as an FBI informant. The ALJ's language conceals this evidence, stating merely that "[t]he claimant testified that no one likes him because they have accused him of doing work for the Federal Bureau of Investigation." (Tr. 15). However, the ALJ makes no reference to the fact that Albanna's memory on this count may result from delusional thinking patterns. The record shows that Albanna's belief that he worked for the FBI stretches back at least as far as his prior ALJ hearing. (Tr. 81-85); *see also* (Tr. 127) ("[T]alked rapidly. Stated he was an undercover FBI agent."). In his testimony before the present ALJ, Albanna said that "I worked for the FBI for the terrorists" and that "[t]hey gave me cash money and I told them no, no I'm not going to work anymore with you. I want a check. I want a check because of the tax, I want to pay tax. . . . Now, all the Arabs know that I work for the FBI." (Tr. 39). According to Albanna, the FBI fired him because "I signed my name that I was working for the FBI against Al Qaeda. Because I told CNN that I wanted cash money, I wanted – they wanted to give me cash money, I wanted a check. So they fired me." (Tr. 40). Following the prior ALJ decision in June 2013, Albanna was admitted to a hospital due to "paranoia, hallucinations, depression and panic attacks along with sleep disturbances." (Tr. 444). While there, he experienced problems

27

such as "anxiety, depression, mood swings, irritability, agitation, paranoia, thinks that FBI is actually after him and trying to harm him. He also thinks that people are threatening him and he has been yelling and screaming at the staff in the ER and he indicated that he was actually getting very angry and agitated at home also." (Tr. *Id.*). That the ALJ passed over this persistent delusion, and the evidentiary record which seems to confirm it, casts doubt on his ultimate conclusion that Albanna is not disabled.

The ALJ also failed to discuss the significance of, or even mention, this week-long psychiatric hospitalization in June 2013. Indeed, the ALJ suggested that "[t]here is no evidence of any inpatient psychiatric hospitalization . . . ." (Tr. 15). Thereafter, he selectively incorporated stray references from the medical record, with the effect of evading Albanna's hospital stay entirely. He noted that a June 4, 2013 report (*e.g.*, the day he was admitted) notes an absence of suicidal ideation, normal psychomotor activity, and normal grooming and hygiene, (Tr. 18), but does not mention that his discharge summary lists the reasons for his admission as "anxiety, depression and thoughts of suicide." (Tr. 446). He points out that "[u]pon discharge from the hospital, the claimant's [GAF] level was 55" without mentioning that his GAF score was 25 when hospitalized, and that the score of 55 was given after nearly a week of inpatient treatment. (Tr. 445). In a particularly misleading characterization, the ALJ directed the reader to Dr. Yousef's medical source statement. (Tr. 18). Dr. Yousef's statement, as the ALJ acknowledges, reported "no psychomotor slowing, better eye contact as the interview progressed, fairly good judgment, and full orientation." (*Id.*). The ALJ's selective description, however, paints an inordinately rosy picture of Dr. Yousef's impressions during Albanna's

interview. Indeed, the ALJ overlooks Dr. Yousef's concerns, in the same report, that Albanna became "more delusional and loose" as the interview progressed, that he spoke "in a delusional way" about losing his family, that he "ha[d] suicidal thoughts," and that he "hear[d] the voices of family members as well as old friends" and "continue[d] to have the[se] paranoid delusions." (Tr. 294). Taken as a whole, the manner in which the ALJ conveyed and evaluated this evidence obscured important contextual matters and distorted the record. *See Krueger v. Comm'r of Soc. Sec.*, 2015 WL 92677172, at \*11 (E.D. Mich. Oct. 19, 2015) ("[T]he ALJ omitted mention of several key pieces of medical evidence which provide support for Krueger's allegations of disabling pain, at least during the period of time closer to the hearing date. As this Court has recognized, where 'the ALJ's selective reliance on 'fragments' of the record amounts to a distortion of the record it cannot be said that substantial evidence supports the . . . determination.'" (internal citation omitted)).

Due to these failings, the record is replete with like instances in which the ALJ appears to pluck facts detrimental to Albanna's case without noting facts which would, if considered, counsel an outcome favorable to Albanna. This defective reasoning appears most prominently in brief factual recitations—which are not realistically inconsistent with the evidentiary record, taken as a whole, of Albanna's impairments—disguised as ripostes to his credibility. For instance, the ALJ takes the fact that Albanna "states that he goes to a mosque on Fridays" as proving him not to be "very withdrawn." *See, e.g.*, *Ellis v. Barnhart*, 392 F.3d 988, 999 (8th Cir. 2005) ("The ability to . . . attend church . . . does not qualify as the ability to do substantial gainful activity."). After mentioning that

Albanna feared social isolation due to his work for the FBI, the ALJ suggested that a single clinical notation in a nursing discharge summary—in which the author writes "He states he has no one to take him to hospital but he states he has a friend that can take him to hospital," (Tr. 542)—somehow elevates his social functioning. (Tr. 15). Such evidence hardly serves to demonstrate Albanna's social capacity. Not only is the recorded statement internally inconsistent, but even if it were not, having "a friend," (Tr. 15), does not make one socially capable. The evidence cited alongside this notation fails to redeem the ALJ's analysis: namely, that the claimant is not isolated because "he lives with his wife and five children," and that the State Agency psychologist determined "that the claimant is only mildly impaired in social functioning." (*Id.*); *see Helsel v. Comm'r of Soc. Sec.*, 2016 WL 6070085, at *11 (E.D. Mich. Sept. 7, 2016) ("That Helsel is 'married' and 'pregnant for a third time' hardly evidences comfort in social functioning, . . . [n]or do the facts that 'she has a friend' and 'her parents visit her home to help her' contradict statements that she does not want to be around others." (internal citations omitted)). And although the State Agency psychologist's opinion may have merit, the ALJ's failure to account for other glaring psychological evidence alongside that opinion taints his analysis as a whole. *See Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("[T]he 'substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951))).

Albanna also criticizes the ALJ's weighing his dearth of medical treatment against his credibility, citing *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). (Doc.

15 at 16). And he argues that—although the ALJ correctly noted that Albanna never sought mental health treatment from Dr. Rahim—such fact evidences nothing; Dr. Rahim "was treating him for *physical* problems," not those relating to mental health. (*Id.*).

Though a claimant's failure to seek or comply with treatment may sometimes implicate her credibility, "[f]or some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009). "[T]he ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (quoting SSR 96-7p, 1996 WL 374186, at *8 (July 2, 1996)).

The ALJ never questioned Albanna's lack of mental health treatment, yet hastened to draw a negative inference from his failure to seek it, as well as his sparse compliance with treatment for physical conditions. *E.g.*, (Tr. 18) ("It is significant that there is no evidence of any psychiatric treatment since June, 2013. . . . It seems likely that there would be much more evidence of psychiatric treatment if the claimant really contended with severe mental functioning symptoms.").

In discussing Albanna's inconsistent or unwise behaviors with respect to physical conditions outside the context provided by his panoply of mental issues, the ALJ sidestepped a holistic analysis of the record's evidentiary implications. For example, the ALJ noted that despite chest pain and shortness of breath, Albanna continued to smoke: "It seems as though he would not smoke if he really contended with significant chest pain and shortness of breath." (Tr. 17). But does one found with conditions such as major

31

depression and schizoaffective disorder—as well as substance abuse problems in the prior ALJ adjudication, (Tr. 134)—truly surprise anyone by failing to kick an addiction?[2] I pose this question not to imply an answer either way, but to note that significant record evidence, omitted from the ALJ's opinion, required its consideration. The ALJ also noted that he was "unsure whether the claimant even regularly takes his medication," and that Albanna's "poor compliance certainly does not help his credibility." (*Id.*). Again, however, a cursory review of the record reveals myriad possible explanations for these instances of noncompliance and inconsistency, many arising from patently obvious impairments in mental and social functioning. This applies as well to the absence of mental complaints in Dr. Rahim's treatment notes, as doctors' specializations implicate not only the validity of their opinions in different contexts, but also the treating relationship sought by the client. *Cf. Schacht v. Colvin*, No. 15-10251, 2016 WL 2733140, at *5 (E.D. Mich. May 5, 2016) ("[T]he ALJ reasonably concluded that as a psychologist, Dr. Bray was more qualified to express an opinion as to his mental status than Dr. Dua, a primary care physician, was." (citing 20 C.F.R. § 404.1527(c)(5))). That the ALJ declined to meaningfully grapple with such explanations reflects poorly on his opinion. *Accord Wilson v. Colvin*, No. 2:14-CV-116-TLS, 2016 WL 5403114, at *7 (N.D. Ind. Sept. 28, 2016).

For these reasons, I cannot say the ALJ's decision as to Albanna's mental impairments is based on substantial evidence.

---

[2] The ALJ also declined to include, at this juncture, that the prior ALJ determined Albanna's "substance abuse of prescription medication" to be a severe impairment. (Doc. 15, Ex. A at 6-7).

### 2.    The ALJ Did Not Err in Evaluating the Severity of Albanna's Cardiac Problems

Albanna contends that the ALJ's RFC assessment fails to reflect the impact his coronary artery disease might have on his ability to work. (Doc. 15 at 17). He suggests that the ALJ "never explained precisely how that severe impairment would impact [his] ability to perform work activity." (*Id.*). In light of the "sheer frequency of [his] [medical] visits, and the problems that motivated them," the ALJ should further consider these impairments. (*Id.*).

"[T]he ALJ need not expressly mention every piece of evidence so long as the overall decision was supported by substantial evidence." *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 250 (6th Cir. 2015). Nevertheless, Albanna's argument contains a shred of merit—the ALJ's discussion of limitations caused by coronary artery disease remains somewhat vague at times. (Tr. 15-18) (mentioning "chest pain" and "shortness of breath," but in the context of Albanna's credibility determination). That the ALJ omits the words "coronary artery disease" in his RFC assessment compounds this problem. Nevertheless, the ALJ's references to Albanna's denials of chest pain and shortness of breath in the medical records, (Tr. 17), indicates that his RFC accounts for Albanna's coronary artery disease, and implies that the severity of such symptoms is low. His findings on this count are thus supported by substantial evidence. *See, e.g.*, *Dakroub v. Comm'r of Soc. Sec.*, 2016 WL 5539760, at *11 (E.D. Mich. Aug. 1, 2016) (upholding "minimal" review of obesity in an RFC where an ALJ's "reference to medical records indicating that [the claimant] was exercising at the gym . . . after his alleged onset date"

made clear that she had "considered [the claimant's] obesity throughout the sequential analysis). On remand, however, the ALJ is well advised to ensure his language provides as little room for interpretation as possible. *Accord Schlicker v. Comm'r of Soc. Sec.*, 2011 WL 5865148, at *10 (E.D. Mich. Nov. 4, 2011) ("[O]nce [the ALJ] acknowledged that [dizziness] was a medically determinable impairment with the requisite severity, he had at least a limited obligation to state how he accounted for the impairment in his RFC (or why it did not).").

### 3.   The ALJ's RFC Did Not Adequately Account for Albanna's Language Difficulties

Albanna asserts that the ALJ erred in declining to follow the prior decision's finding as to his language difficulties. (Doc. 15 at 18). Alternatively, Albanna argues that his language difficulties "would obviously have been a vocational barrier," even if not illiterate. (*Id.*).

The prior ALJ's decision found that "[t]he claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English . . . ." (Doc. 15 at 12). "When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond*, 126 F.3d at 842.  A future determination is bound by prior determinations absent new and material evidence of changed circumstances.

The ALJ held out a single page of the medical record as seemingly conclusive proof that Albanna may be lying about, or at least mischaracterizing, his lingual abilities:

34

"[P]age seven of Exhibit B-11F states that he is able to speak English and that he spoke only occasionally in Arabic to staff at Oakwood Hospital. This disparity raises a serious question whether the claimant really speaks very little English. The disparity also detracts from his overall credibility." (Tr. 16). In fact, the record says that "[h]e was able to speak English, but occasionally interspersed with an Arabic . . . ." (Tr. 468). The note's language connotes, at most, a limited capacity to speak broken English. It does not establish a capacity to "speak English," full stop. Albanna astutely notes that a limited ability to speak English would remain a vocational barrier. *Cf. Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize ["critical differences between the activities of daily living and activities in a full-time job"] is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.").

Further, the ALJ found his nearly three-decade residency and work history in the United States as evidence that he "likely . . . needed to speak English at those jobs." (Tr. 16). The ALJ also recounts how "[m]ultiple notes in Exhibit B-13F state that he has a ninth-twelfth grade education." (Tr. 13). At no point does the ALJ suggest that this evidence is new and material; it baldly looks to be neither. For these reasons, each statement impermissibly contravenes the prior ALJ's finding of illiteracy, for it speaks to Albanna's literacy in an already adjudicated period.[3] Due to his improper inferences, in turn, the ALJ's finding as to Albanna's literacy appears to rest on a single page of the medical record—which is not sufficiently material evidence of a change in the circumstances surrounding Albanna's literacy, or lack thereof. *Cf. Caudill v. Comm'r of*

---

[3] Of note, the ALJ does not recite the legal standard for collateral estoppel in his opinion.

*Soc. Sec.*, 424 F. App'x 510, 516 (6th Cir. 2011) (finding the facts that the claimant "admitted being able to read and write a grocery list," "successfully worked for many years," had "at least a fair ability to understand, retain, and follow instructions," and "attended school into the twelfth grade and his school records showed that he averaged Bs, Cs, and Ds in high school" to be substantial evidence that the claimant was not "illiterate"). That Albanna required an interpreter at his hearing before the ALJ, a fact not mentioned in the ALJ's opinion, buttresses my conclusion as to this facet of the ALJ's analysis. (Tr. 31-32).

In short, the ALJ committed error when he weaponized thinly-substantiated doubts as to Albanna's illiteracy against Albanna's credibility. Upon independent review of the record, I find insufficient material evidence that Albanna has since become proficient (or at least not "illiterate") in English. *E.g.*, (Tr. 243) ("He apologized several times for not speaking English well, . . . but did well on his own with all but a few words."); (Tr. 256-63) (Albanna's Function Report, filled out by another person); (Tr. 293) ("His English is poor."); (Tr. 323) ("Pt speaks *adequate* English and his wife is *fluent*."); (Tr. 373) ("There is a little bit of a language barrier. He speaks English well. He says he has a hard time understanding it."). In truth, whether Albanna's language skill improved is a difficult factual question. But the fact that some evidence implies Albanna is capable of articulating certain words relating to his impairments in the context of (frequent) hospital visits caused by those impairments likely does not illustrate a changed circumstance worthy of overriding the prior ALJ's illiteracy determination. As such, I cannot in good conscience find the ALJ's error harmless.

Once it has been determined that the Commissioner's administrative decisions are not supported by substantial evidence, a district court faces a choice. It may either remand the case to the Commissioner for further proceedings or direct the Commissioner to award benefits. The court may reverse and direct an award of benefits if "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits . . . where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Felisky*, 35 F.3d at 1041; accord, *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir.1994). This comports with the principle that "where remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game." *Wilson v. Comm'r of Soc. Sec.*, 378 F3d 541, 547 (6th Cir.2004) (citations omitted).

In this case, the Court finds that the ALJ's findings are, in part, not supported by substantial evidence. Because this Court is not equipped to re-weigh the relevant evidence, yet the proof of disability is not so overwhelming that a remand for benefits would be appropriate, the matter should be remanded for further consideration. *See Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 438 (6th Cir. 2013) ("These legal errors are not harmless because they effectively result in disregard of nearly all of the medical evidence supporting a finding that Minor is disabled."); *Faucher*, 17 F.3d at 176 ("A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking."). Therefore, the Court recommends remanding under sentence four for further proceedings.

37

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Albanna's Motion for Summary Judgment, (Doc. 15), be **GRANTED**, the Commissioner's Motion, (Doc. 16), be **DENIED**, and that this case be remanded under sentence four of 42 U.S.C. § 405(g) for further consideration.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party

may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  November 22, 2016                     S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: November 22, 2016                      By s/Kristen Castaneda
                                             Case Manager